1
2
3
4                          UNITED STATES DISTRICT COURT

5                               DISTRICT OF NEVADA

6                                     * * *

7   MARIA C. TORRES,                          Case No. 2:13-cv-00082-GMN-PAL

8                          Plaintiff,         **REPORT OF FINDINGS AND**
                                              **RECOMMENDATION**
9        v.

10  CAROLYN W. COLVIN, Acting                 (Mtn. to Remand – Dkt. #16)
    Commissioner of Social Security,          (Mtn. to Affirm – Dkt. #23)

11                         Defendant.

12

13          This case involves judicial review of administrative action by the Commissioner of Social

14   Security denying Plaintiff Maria Torres' claim for Supplemental Security Income ("SSI")

15   benefits under Title XVI of the Social Security Act (the "Act").

16                                   **BACKGROUND**

17          On May 20, 2010, Torres filed her application for SSI benefits, alleging she became

18   disabled on that same day.  AR[1] 138.  The Social Security Administration ("SSA") denied

19   Torres's application initially and on reconsideration.  AR 70-80.  Torres requested a hearing

20   before an Administrative Law Judge ("ALJ"), and a hearing was held before ALJ Donald R.

21   Colpitts on February 15, 2012, in Las Vegas, Nevada.  AR 41-57.  In a decision dated February

22   17, 2012, the ALJ found Torres was not disabled.  AR 14-36.  Torres requested a review of the

23   ALJ's decision by the Appeals Council.  AR 11-13.  The ALJ's decision became the

24   Commissioner's final decision when the Appeals Council denied review on October 24, 2012.

25   AR 3-10.

26

27   _____
     [1]AR refers to the Administrative Record, which was delivered to the undersigned upon the
28   Commissioner's filing of her Answer (Dkt. #10) on May 7, 2013.

                                           1

On March 4, 2013, Torres filed an Application to Proceed In Forma Pauperis (Dkt. #1) and submitted a Complaint (Dkt. #3) seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The court screened the Complaint pursuant to 28 U.S.C. § 1915, directed the Clerk to file the Complaint, and directed service.  *See* Order (Dkt. #2).  The Commissioner filed her Answer (Dkt. #10) on May 7, 2013.  Torres filed a Motion to Reverse or Remand (Dkt. #16) on August 8, 2013.  The Commissioner filed a Cross-Motion to Affirm and Opposition (Dkt. #23) on November 1, 2013.  The court has considered the Motion to Reverse or Remand and the Opposition and Cross-Motion to Affirm.

I.    **Judicial Review of Disability Determination.**

District courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after the Commissioner of Social Security has held a hearing and rendered a final decision, a disability claimant may seek review of the Commissioner's decision by filing a civil lawsuit in federal district court in the judicial district where the disability claimant lives.  *See* 42 U.S.C. § 405(g).  That statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  *Id.*  The Ninth Circuit reviews a decision of a district court affirming, modifying, or reversing a decision of the Commissioner de novo.  *See Batson v. Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d

2

1211, 1214 n. 1 (9th Cir. 2005).   In determining whether the Commissioner's findings are supported by substantial evidence, the court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Under the substantial evidence test, the Commissioner's findings must be upheld if supported by inferences reasonably drawn from the record. *Batson,* 359 F.3d at 1193.   When the evidence will support more than one rational interpretation, the court must defer to the Commissioner's interpretation. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human Serv.,* 44 F.3d 1453, 1457 (9th Cir. 1995).   The issue before the court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent on the ALJ to make specific findings so that the court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence.   Mere cursory findings of fact without explicit statements as to what portions of the evidence were accepted or rejected are not sufficient. *See Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).   The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Id.*

## II.   **Disability Evaluation Process.**

The claimant has the initial burden of proving disability. *See Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).   To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).   The claimant must provide "specific medical evidence" to support his or her claim of disability.   If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to

/ / /

3

1    show that the claimant can perform other substantial gainful work that exists in the national

2    economy. *See Batson*, 157 F.3d at 721.

3        The ALJ follows a five-step sequential evaluation process in determining whether an

4    individual is disabled. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert,* 482 U.S. 137, 140

5    (1987).  If at any step the ALJ makes a finding of disability or non-disability, no further

6    evaluation is required. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v.*

7    *Thomas*, 540 U.S. 20, 24 (2003). The first step requires the ALJ to determine whether the

8    individual is currently engaging in substantial gainful activity ("SGA").  *See* 20 C.F.R.

9    §§ 404.1520(b) and 416.920(b).  SGA is defined as work activity that is both substantial and

10   gainful; it involves doing significant physical or mental activities, usually for pay or profit. *See*

11   20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b).  If the individual is currently engaging in SGA,

12   then a finding of not disabled is made.  If the individual is not engaging in SGA, then the

13   analysis proceeds to the second step.

14       The second step addresses whether the individual has a medically-determinable

15   impairment that is severe or a combination of impairments that significantly limits him or her

16   from performing basic work activities.  *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c).  An

17   impairment or combination of impairments is not severe when medical and other evidence

18   establish only a slight abnormality or a combination of slight abnormalities that would have no

19   more than a minimal effect on the individual's ability to work.  *See* 20 C.F.R. §§ 404.1521 and

20   416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[1]  If the individual does not

21   have a severe medically-determinable impairment or combination of impairments, then a finding

22   of not disabled is made.  If the individual has a severe medically-determinable impairment or

23   combination of impairments, then the analysis proceeds to the third step.

24       Step three requires the ALJ to determine whether the individual's impairments or

25   combination of impairments meet or medically equal the criteria of an impairment listed in 20

---

26   [1] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r*

27   *of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).
     They are entitled to some deference as long as they are consistent with the Act and regulations.

28   *See Bray,* 554 F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.   If the individual's impairment or combination of impairments meet or equal the criteria of a listing and meet the duration requirement (20 C.F.R. §§ 404.1509 and 416.909), then a finding of disabled is made.  *See* 20 C.F.R. §§ 404.1520(h) and 416.920(h).  If the individual's impairment or combination of impairments does not meet or equal the criteria of a listing or meet the duration requirement, then the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the individual's residual functional capacity ("RFC").  *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e).  RFC is a function-by-function assessment of the individual's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments.  *See* SSR 96-8p.  In making this finding, the ALJ must consider all the relevant evidence such as symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence.  *See* 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p.  To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  The ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

The fourth step requires the ALJ to determine whether the individual has the RFC to perform his past relevant work ("PRW").  *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f).  PRW means work performed either as the individual actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the individual to learn the job and to perform it as SGA.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965. If the individual has the RFC to perform his past work, then a finding

/ / /

5

of not disabled is made.  If the individual is unable to perform any PRW or does not have any PRW, then the analysis proceeds to the fifth and final step.

Step five requires the ALJ to determine whether the individual is able to do any other work considering his residual functional capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520(g) and 416.920(g).  If he or she can do other work, then a finding of not disabled is made.  Although the individual generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the individual can do.  *Yuckert*, 482 U.S. at 141-42.

### III.  Factual Background.

Torres filed a claim for disability benefits at age twenty-eight, alleging she became disabled and unable to work on May 10, 2010, because of symptoms and limitations arising from asthma, depressive mood disorder, and a lumbar back condition.  Plaintiff's sole issue in this appeal is whether the ALJ committed reversible error by improperly assessing Torres' subjective symptom testimony.

#### A.  Testimony at the Administrative Hearing.

Torres appeared and testified before ALJ Donald Colpitts in Las Vegas, Nevada, on February 15, 2012, with her attorney Charles J. York.  AR 20-57.  Vocational Expert Robin Generaux also appeared and testified.  *Id*.

Torres was born on June 8, 1981, and at the time of the administrative hearing, she was thirty years old.  AR 43, 144.  Torres dropped out of high school in the eleventh grade but later graduated from a medical assistant training program.  AR 45-46.  Torres has never been married and lives with her mother and thirteen year-old son.  AR 50.  Torres' mother handles Torres' financial affairs with a power of attorney.  AR 50-53, 138.  Torres testified that she did not drive because it is uncomfortable for her to move her foot from the gas pedal to the brake or sit in the car for long periods of time.  AR 50.

/ / /

Torres was involved in a motor vehicle accident on October 21, 2000, when she was twenty-years old. AR 54. She injured her knees and back in the accident. AR 48. The pain in Torres' back started in her lumbar spine, but since the accident, it spread from her lumbar spine to her sacrum and tailbone. AR 55. Torres has had two ruptures and two hernias. AR 55. She sought medical treatment from various physicians. AR 48. Dr. Thomas Dunn recommended laser surgery to repair Torres' ruptured discs as a last resort; but Torres did not elect to proceed with the surgery. *Id.* Torres has received epidural injections from Dr. Fishell, but she testified they did not help to alleviate her pain. *Id.* She also underwent a discogram,[1] and the results were positive.[2] *Id.* At the time of the administrative hearing, Torres was treating with Dr. Uruene,[3] a physician specializing in pain management. AR 49. Torres testified that she saw Dr. Uruene once per month for her medication refills, specifically Kadian (time-released morphine), Percocet (a narcotic pain reliever), Soma (a muscle relaxer), and Xanax (an anti-anxiety medication). AR 49. Torres takes two doses of Kadian per day, and she testified that it "kind of numb[s] your mind to the fact that you're feeling pain. So I mean I wouldn't really say that it helps." AR 50. She testified that she experiences nausea and dizziness when she takes it, and she never takes it unless her mother is there to supervise her.[4] *Id.*

---

[1] There are no medical records in the AR documenting the epidural injections or the discogram. The only mention of these procedures in any records is medical history section of various treatment notes. The treatment notes only refer generally to the fact that Torres underwent these procedures, but there is no indication of when these procedures occurred. The treatment notes also indicate the epidural injections were not successful in relieving Torres' pain.

[2] A discogram is a test used to evaluate back pain, where dye is injected into the center of a spinal disc. The injection itself sometimes reproduces a patient's back pain, and/or the dye will move into cracks in the disc's exterior and will appear on an x-ray or CT scan. Because of its invasive nature, a discogram is generally undertaken only where back pain persists despite conservative treatment like medication and physical therapy. Typically, results of a discogram are combined with results from other tests, like MRI or CT scans and physical examinations, to determine a treatment plan for back pain. *See generally* Mayo Clinic, Tests and Procedures: Discogram (Feb. 12, 2012), available at www.mayoclinic.org/tests-procedures/discogram/basics/definition/prc-20013848 (last visited Aug. 15, 2014).

[3] Phonetically misspelled as "Irani" in the hearing transcript.

[4] In a diability report Torres submitted in support of her appeal on May 24, 2011, she reported that she experiences slight nausea from her morphine and itching from her Percocet. AR 202.

She told the ALJ that without medication, her pain was excruciating, and there were days where she could not get out of bed.  AR 50.  She testified that she felt pressure points in her lower back, as if bed springs were poking her.  AR 51.  Her back became hot, her sciatic nerve got pinched, and she felt pain all the way down to her knee when she tried to walk.  *Id.*  When she lived alone, there were times when she fell and could not get back up.  *Id.*  She testified that her sciatic nerve pain caused problems turning corners and caused her to bump into things.  AR 52.  She testified that she could not walk very far without pain or stand for long periods of time.  *Id.*  Torres testified she could not walk for more than one hundred yards without a burning sensation in her lower back and could not carry more than a few ounces at a time.  AR 52.  She also had trouble controlling her aggression, and she suffered from depression and anxiety.  AR 53.  She cried without reason or over "little things."  AR 54.  Torres admitted to smoking marijuana in the past for pain relief but denied the use of any "hard drugs," including methamphetamine.  AR 54.

Torres testified she worked as a medical assistant for Dr. Tony Garcia at Family Medical Group Quick Care from 1999-2001.  AR 44, 45, 46.  Her job duties consisted of patient triage and care, phlebotomy, IVs, inventory restocking, and injecting medications.  AR 44, 147.  Before this, Torres worked as a medical extern while she was enrolled at The Academy of Healing Arts.  AR 45.  Dr. Garcia noticed Torres had pain on the job, and after examining her, he referred her to an orthopedic surgeon, who determined that she had degenerative disc disease.  AR 46.  Dr. Garcia terminated Torres from employment in 2001 because she could not perform the essential job functions due to her degenerative disc disease and the hours she was required to work.  AR 46.  She did not look for a job after that because no employer "would have even considered taking a medical assistant that couldn't really do her job."  AR 46.  She testified she was unable to work due to the pain in her lower back, legs, sciatic nerve, and her depression.  AR 49, 51-53.

Vocational Expert Robin Generaux also testified.  AR 55-56.  She described Torres's past work as a medical assistant as light work.  *Id.*  The VE testified that if Torres could perform only light work, then Torres could perform her past work.

/ / /

8

**B. Torres' Medical Records Prior to Alleged Disability Onset Date.**

**1. St. Rose Dominican Hospital Records.**

On December 27, 2007, Torres was admitted to St. Rose Dominican Hospital – Siena Campus ("St. Rose") for evaluation of a suicide attempt.  AR 228.  Torres's brother told hospital staff that Torres had taken "multiple doses" of Ultram, Valium, Xanax, and Flexeril.  AR 228.  She was treated with charcoal and vomited pill fragments.  *Id.*  She admitted to attempting suicide by ingestion.  *Id.*

Torres was again admitted to St. Rose on November 17, 2008.  AR 215.  Paramedics brought her to the emergency room after a respiratory arrest caused by ingesting five Soma pills after previously taking Xanax.  *Id.*  Torres's mother found her and called 911 when she could not revive Torres.  AR 217.  Torres denied any suicidal thoughts or ideation, though the intake notes reflect she had a history of suicide attempts on three prior occasions.  AR 215.  Another record from the same admission, however, indicates that Torres "seems to just not want to live and again has taken a dose of Soma pills to kill herself."  AR 217.  Torres was admitted to the Intensive Care Unit in stable condition.  AR 218.

**2. Center for Pain Management.**

Torres had frequent appointments with Dr. Max Carter and Dr. Charles H. Tadlock at the Center for Pain Management prior to the alleged disability onset date throughout 2008, 2009, and 2010.  AR 253-277.  On January 15, 2008, Torres reported continued pain and no response to morphine.  AR 277.  On February 12, 2008, Torres reported some improvement on morphine.  AR 276.  On April 11, 2008, Torres reported exacerbation of her back pain, but the progress note indicates she was stable on her medications.  AR 275.  On May 9, 2008, the progress note indicates that Torres had a positive discogram and was offered laser therapy, which she declined.  AR 274.  On October 14, 2008, Torres reported that she did not like the morphine she was taking because it made her sick.  AR 269.  She requested a larger dose of Percoset, which was denied, and the doctor instead prescribed her OxyContin.  *Id.*  On November 14, 2008, the progress note reflects that Torres was doing well on her current medications.  AR 268.  On December 22,

2008, Torres reported having severe pain in both sacroiliac joints[5] and both trochanteric bursae.[6] AR 267.  The progress notes indicate that Torres could receive injections upon Dr. Tadlock's return.  *Id.*

On February 3, 2009, the progress note indicates Torres tested positive for methamphetamine in the past, but she tested clean at that visit.  AR 266.[7]  On May 29, 2009, the progress note indicates Torres had run out of her medication and was in extreme pain.  AR 263.  On July 7, 2009, Torres tested positive for marijuana use, and the clinic warned her that if she tested positive again, it would no longer see her as a patient.  AR 261.  On August 14, 2009, Torres tested positive for marijuana again, and Torres was advised to "cut back" on her use of marijuana because it is illegal, or the clinic would discharge her.  AR 259.  On September 22, 2009, the progress note indicates Torres "continues to do well," and she had no new complaints.  AR 257.  On March 30, 2010, Torres complained of pain while walking up and down stairs, and Dr. Carter filled out a request form for a lower level apartment.  AR 251.  Dr. Carter would not request any modification of Torres's living quarters.  *Id.*  On May 7, 2010, claimed her pain had not improved since her last visit despite taking her medication as prescribed, but she also did not require more medication for relief of her pain.  AR 249.  The progress note indicates Torres was

/ / /

---

[5] The sacroiliac joint ("SI joint") describes the area where the sacrum and iliac bones join.  The sacrum is located at the base of the spine and is made up of five vertebrae that are fused together.  The iliac bones are the two large bones that make up the pelvis.  The sacrum sits in the center of the iliac bones.  *See* "Sacroiliac joint pain," Medline Plus (Aug. 25, 2012), available at www.nlm.nih.gov/medlineplus/ency/patientinstructions/00610.htm (last visited Aug. 18, 2014).

[6] Bursae are small, jelly-like sacs located throughout the body around the joints.  They contain a small amount of fluid and are positioned between bones and soft tissues, acting as cushions to reduce friction.  There are two major bursae in the hip, one of which covers the bony point of the hip bone called the greater trochanter.  *See* "Hip Bursitis," American Academy of Orthopaedic Surgeons (March 2014), available at www.orthoinfo.aaos.org/topic.cfm?topic=a00409 (last visited Aug. 18, 2014).

[7] Torres disputes that she has ever used methamphetamine.  AR 51.  At the hearing, when the ALJ asked whether Torres had ever used methamphetamine, she responded "No, never.  It came up on a doctor's visit, and they retested me because I was adamant.  I don't mess with anything that has to, no hard drugs. . . . They retested me for that, and it came up negative, and he [the doctor] apologized actually."  *Id.*

satisfied with her treatment, and her pain had not increased.  *Id.*  She denied any issues with nausea, urination, constipation, itching, confusion, or sleepiness.  *Id.*

### C. Torres' Medical Records –Post-Alleged Disability Onset Date.

### 3. Adult Function Report

Torres completed an Adult Function Report on July 17, 2010.  AR 164-171.  She wrote that she has a personal care assistant who is with her twelve hours per week and cooks for her and helps her bathe.  AR 164.  Torres could not take care of herself and her son the way she could before her accident.  AR 165.  She does not take care of anyone else or any pets.  *Id.*  She needs reminders to take care of her personal needs and grooming and to take her medication.  AR 166.  She could not cook her own meals because she could stand for a long time.  *Id.*  She did not do household chores or yard work.  *Id.*  She only left the house once per month for about twenty minutes at a time.  AR 167.  Her mother did Torres' shopping, and Torres could not handle any financial matters.  *Id.*  She did not have any hobbies or spend time with others, and sometimes, she did not want anyone to talk to her.  AR 168.  She could walk two minutes before needing to rest, she did not finish things she started, and she did not follow written or oral instructions well.  AR 169.  She used a cane, walker, or wheelchair every day, all of which had been prescribed by a doctor in 2004.  AR 170.[8]

### 4. Disability Determination Services Medical Consultation.

Torres was seen by Dr. Khalid A. Kamal, M.D., on October 5, 2010, for a consultative examination requested by the Disability Determination Service ("DDS").  AR 283-288.  Dr. Kamal reviewed medical records from the Center for Pain Management and a lumbar spine x-ray.  AR 286.  He noted that Torres was seen in the emergency room after her motor vehicle accident, and it was likely she had a herniated disc of the lumbar spine, but no surgical

---

[8] Dr. Max Carter also prescribed Torres a motorized wheelchair on June 14, 2010, because of spinal stenosis, a disorder involving narrowing of the spaces in the spine that cause pressure on the spinal cord and/or nerve roots, causing pain.  AR 181; *see also* "Questions and Answers about Spinal Stenosis, NIH Publication No. 09-5327 (Jan. 2013), available at www.niams.nih.gov/Health_Info/Spinal_Stenosis (last visited Aug. 15, 2014).  Dr. Carter also prescribed the personal care assistant to Torres on May 18, 2010.  AR 185.

procedures were recommended.  AR 283.  Dr. Kamal observed that Torres was credible, cooperative, and friendly during the exam, and her movements were normal, she could sit comfortably without shifting in the chair and could stand up from sitting and sit up from a supine position without difficulty.  AR 284.  He noted tenderness on palpation of the spine and decreased tone without spasm in the paravertebral muscles.  AR 285.  He observed slightly increased curvature in the mid-thoracic area.  *Id.*  He diagnosed Torres with thoracolumbar arthralgia[9] with reports of lumbar radiculopathy, minimal discogenic disease, and depression/anxiety disorder.  AR 286.

Dr. Kamal opined Torres could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; could stand or walk six hours in an eight-hour workday; did not require an assistive device to ambulate; could sit eight hours of an eight-hour workday; and if she needed to alternate sitting and standing, standard breaks and a lunch period would provide sufficient relief. AR 287.  He found Torres could frequently climb ramps or stairs and balance, and she could occasionally climb ladders or scaffolds, stoop or bend, kneel, crouch or squat, and crawl.  *Id.*  He also opined Torres should avoid heights and moving machinery for safety reasons.  AR 288.

**5.  Bureau of Disability Adjudication Mental Status Examination.**

Dr. Maria G. Doncaster, Ph.D., conducted a mental status examination of Torres on October 20, 2010.  AR 291-294.  Torres reported that she had been hospitalized in 2009 for attempted suicide, her fourth such hospitalization.  AR 292.  After the 2009 attempt, she was involuntarily committed for three days.  *Id.*  She told Dr. Doncaster she could understand, remember, and follow simple one or two-step instructions, detailed instructions, and extensive complex instructions.  *Id.*  Dr. Doncaster found that although Torres' ability to understand, remember, and follow simple, one- or two-step instructions was intact, and Torres could follow these sort of instructions on a sustained basis, her ability to do the same with either detailed

---

[9] Pain in the thoracic and lumbar spine.  *See* "Thoracolumbar," The American Heritage Medical Dictionary (2007), available at www.medical-dictionary.thefreedictionary.com/thoracolumbar (last visited Aug. 18, 2014); Hardin, Joe G, *Clinical Methods: The History, Physical, and Laboratory Examinations* 757 (Walker, HK, et al., eds., 3d ed. 1990), available at www.ncbi.nlm.nih.gov/books/NBK303 (last visited Aug. 18, 2014).

instructions or an extensive variety of complex instructions was poor, and Torres would be unable to follow these sort of instructions on a sustained basis.  AR 293, 294.

Torres also reported she could feed herself but needed assistance bathing and dressing. AR 292.  She told Dr. Doncaster she normally woke sometime between noon and 3 or 4 p.m., ate dinner around 8 p.m., and went to sleep between 7 and 11 a.m.  *Id.*  She stayed up all night watching television or doodling.  *Id.*  Torres reported that she liked to doodle, read, and did crossword puzzles, left home for doctor's appointments and sometimes for her son's school functions, and she helped around the house folding laundry.  AR 292, 293.

Dr. Doncaster found Torres' attention, concentration, effort, and consistency were stable, but her motivation was inconsistent.  AR 293.  Dr. Doncaster opined that she could get along with peers and authority figures.  AR 294.  Torres' prognosis was that she would have a "difficult time returning to the competitive workplace," and if she were awarded disability benefits, her mother would need to control Torres' finances.  *Id.*

### 6. Radiographical Medical Group.

An October 21, 2010, x-ray of Torres's lumbosacral spine showed minimal discogenic disease at L4-L5; sclerosis[10] and narrowing of the lower apophyseal and SI joints; and splinting to the right, suggestive of muscle spasm.  AR 289.

### 7. State of Nevada Bureau of Disability Adjudication Worksheet.

In a Development Summary Worksheet prepared State of Nevada Bureau of Disability Adjudication, the notes from October 26, 2010, reflect that there were a number of contradictions contained in the consultative examination reports concerning Torres' ability to ambulate.  AR 318.  In addition, on Torres's original application for disability benefits, she indicated that she could not speak or understand English, but she did not have difficulty speaking or understanding English during her examinations, and she also said she took her driver's license test in English. *Id.*  She read and completed her Activities of Daily Living Questionnaires in English.  Finally, the agency noted that the Torres's allegations about the severity of her symptoms were not

---

[10] Pathological hardening of tissue, especially from overgrowth of fibrous tissue or increase in interstitial tissue.  *See* "Sclerosis," Merriam-Webster Dictionary (2014), available at www.merriam-webster.com/dictionary/sclerosis (last visited Aug. 19, 2014).

1   supported by the results of the consultative examinations. *Id.* The development summary

2   worksheet concludes that "credibility is an issue." *Id.*

3   **8. Psychiatric Review Technique & Mental RFC Assessment.**

4   Dr. Pastora Roldan, Ph.D., completed a psychiatric review technique form and mental

5   RFC assessment for Torres on November 2, 2010, assessing her between May 10, 2010, and

6   November 2, 2010. AR 296-313. Dr. Roldan opined Torres suffered from an affective disorder,

7   evidenced by depressive symptoms, including anhedonia (the pervasive loss of interest in almost

8   all activities), appetite disturbance with change in weight, sleep disturbance, feelings of guilt or

9   worthlessness, difficulty concentrating or thinking, and thoughts of suicide. AR 299. In

10  addition, Torres' disorder was also evidenced by manic syndrome, characterized by decreased

11  need for sleep and easy distractibility. *Id.* Dr. Roldan opined Torres suffered from Bipolar I

12  disorder. *Id.*

13  She considered the Paragraph B criteria of Listing 12.04[11] and found Torres would be

14  moderately restricted in her activities of daily living, have mild difficulties in maintaining social

15  functioning, and have mild difficulties in maintaining concentration, persistence, or pace. AR

16  306. Dr. Roldan indicated there was insufficient evidence to determine whether Torres had

17  suffered episodes of decompensation of extended duration. *Id.* Additionally, she found evidence

18  did not establish the presence of any C criteria for Listing 12.04. AR 307.

19  With regard to Torres' mental RFC, Dr. Roldan opined Torres was not significantly

20  limited in her ability to remember locations and work-like procedures or in her ability to

21  understand and remember very short and simple instructions. AR 310. Torres was moderately

22  limited, however, in her ability to understand, remember, and carry out detailed instructions. *Id.*

23  Torres was not limited with respect to any other mental activity related to sustained

24  concentration or persistence. AR 310-11. Dr. Roldan opined Torres could maintain

25  concentration and attention for simple job tasks and instructions in two hour increments and

26  would be able to sustain an eight hour per day/forty hours per week work schedule on a sustained

27
28  [11] Listing 12.04 covers affective disorders, characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. *See generally* Listing 12.04, 20 C.F.R. Part 404, Subpart P, Appendix 1.

basis.  AR 312.  Torres was not limited in her ability to interact socially or in her ability to adapt to various situations.  AR 311.  Dr. Roldan opined Torres could relate to and accept direction from supervisors, remain socially appropriate with co-workers and the public without being distracted by them.  AR 312.  Additionally, Torres could travel, avoid workplace hazards, respond to change, and set realistic goals.

### 9.  Physical RFC Assessment.

Andy Cosper, a single decisionmaker ("SDM"),[12] completed a Physical RFC Assessment of Torres on November 3, 2010.  AR 67, 68.  In rendering his opinion, the SDM considered Torres's medical records.  AR 70.  The SDM opined Torres could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk about six hours of an eight-hour workday, sit about six hours in an eight-hour workday, and undertake unlimited pushing or pulling.  AR 60.  Torres could also climb ramps or stairs frequently and ladders, ropes, or scaffolds occasionally.  AR 62.  She could balance frequently and stoop, kneel, crouch, or crawl occasionally.  *Id.*  She had no manipulative, visual, or communicative limitations.  AR 63-64.  She could have unlimited exposure to extreme heat or cold, wetness, humidity, noise, vibration, fumes, odors, gases, and poor ventilation, but she should avoid concentrated exposure to hazards, including machinery or heights.  AR 64.  The SDM observed that Torres' allegations of physical limitations were not fully supported by the objective medical findings.  AR 65.  The SDM also found that a light RFC is more consistent with overall medical evidence than the medical source statement provided by Dr. K. Kamal.  AR 66.

### 10. Apex Medical Center.

Dr. Alafuro Oruene of the Apex Medical Center saw Torres on October 1, 2010, for low back pain.  Torres reported that her pain was continuous and described it as aching, throbbing, sharp, and radiating into both legs.  AR 319.  Her condition was aggravated by standing more

---

[12]  A single decisionmaker is authorized by the SSA to make certain initial determinations without requiring a medical or psychological consultant's signature.  *See generally* "Single Decisionmaker Model," a publication by the Office of the Inspector General for the SSA (Aug. 2013), available at www.ssa.gov/audits-and-investigations/audit-reports/A-01-12-11218 (last visited Aug. 15, 2014).

than thirty minutes, lifting, and bending.  She told Dr. Oruene that pain medication alleviated her pain.  *Id.*  Her previous treatments included injections, chiropractic care, epidural injections, and physical therapy, none of which relieved her symptoms.  *Id.*  Dr. Oruene's progress note indicates Torres had no difficulty with concentration, anxiety, depression, suicidal thoughts, or difficulty with sleeping.  AR 320.  She had normal flexion of the cervical spine, but decreased flexion of the lumbosacral spine.  AR 321.  No paraspinal muscle tenderness was observed.  *Id.*  Dr. Oruene assessed Torres with low back pain, lumbar facet syndrome, lumbar radiculopathy, chronic pain syndrome, and anxiety.  *Id.*

She saw a doctor at Apex Medical Center for monthly follow up visits for medication refills on four occasions between November 2010 and March 2011.  AR 323-337.  She was prescribed Percocet, Morphine, Soma, and Xanax, and those medications were refilled at each visit.  *Id.*  At each appointment, she reported her pain was moderately worse.  AR 323, 327, 330, 334.  On March 18, 2011, Torres again denied issues with concentration, anxiety, depression, suicidal thoughts, and reported no difficulty with sleeping.  AR 335.

Dr. Oruene also completed a treating physician questionnaire dated January 27, 2012, relating to Torres's condition from January 13, 2012.[13]  AR 369-371.  He wrote that, during the fifteen months he treated Torres, she suffered from low back pain with radiculopathy, made worse with activity and as a result of Torres's anxiety.  AR 369.  He believed her condition would last at least twelve months, and her prognosis was poor to fair.  *Id.*.  Dr. Oruene's course of treatment was pain management.  *Id.*  He did not believe Torres was a malingerer.  *Id.*  Dr. Oruene believed Torres was incapable of even low stress jobs, and her symptoms would constantly interfere with the attention and concentration required to complete even simple work tasks.  AR 370.

He believed Torres would need to take hourly unscheduled breaks to rest for fifteen minutes before returning to work, and she would need to shift positions at will between sitting, standing, and walking.  *Id.*  Torres did not need a cane or other assistive device, she had a normal

---

[13] This appears to be a typographical error that should read January 13, 2011, rather than opining on Torres' condition over a two week period.

gait, could walk on heels or toes, but could not squat.  *Id.*  He opined Torres could sit, stand, or walk for less than two hours total in an eight-hour workday.  AR 371.  She could occasionally lift less than ten pounds, rarely lift ten pounds, and never lift twenty or fifty pounds.  *Id.*  Her grip strength was normal.  *Id.*  He believed Torres's impairments would cause good days and bad days, and she would be absent from work more than four days per month due to her impairments or treatment.  *Id.*

**11. Psychiatric Review Technique & Mental RFC Assessment.**

Dr. Susan Kotler, Ph.D., completed a psychiatric review technique form and a mental RFC assessment for Torres on April 4, 2011.  AR 343-355, 365-368.  The results were exactly the same as the psychiatric review technique completed on November 2, 2010, except that Dr. Kotler opined Torres' bipolar disorder caused moderate, not mild, difficulties in maintaining concentration, persistence, or pace.  AR 353.  Torres' mental RFC results were exactly the same as they were after Dr. Roldan's evaluation on November 2, 2010.  *Compare* AR 365-368 *with* AR 310-312.

**12. Physical RFC Assessment.**

Dr. Mayenne Karelitz, M.D., a medical consultant, completed a physical RFC assessment of Torres on April 4, 2011.  She opined that Torres could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for about six hours in an eight-hour workday, sit with normal breaks for about six hours of an eight-hour workday, and was unlimited in her ability to push and pull.  AR 358.  Torres could frequently climb ropes or stairs and balance; she could occasionally climb ladders, ropes, or scaffolds, and could occasionally stoop, kneel, crouch, and crawl.  AR 359.  Torres had no manipulative, visual, or communicative limitations.  AR 360-61.  She had no environmental limitations, except that she should avoid concentrated exposure to hazards like machinery or heights.  Dr. Karelitz found that Torres's allegations about the severity of her symptoms were not supported by objective findings in the medical records.  AR 362.  Dr. Karelitz acknowledged that her opinion differed from that of Dr. Kamal's from October 5, 2010, but indicated the overall evidence supported a light RFC.  AR 363.

**IV.     The ALJ's Decision**

The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520 and 416.920 and issued an unfavorable decision on February 17, 2012.  AR 20-36. At step one, the ALJ determined that Torres had not engaged in SGA since May 20, 2010.  AR 22.  At step two, he determined Torres suffered from the severe impairment of disorder of the lumbar spine.  *Id.*  He found Torres's asthma was not a severe impairment because it was adequately controlled with infrequent medication management.  *Id.*  The ALJ also determined that Torres' medically-determinable mood disorder was non-severe because it did not cause more than minimal limitation in Torres' ability to perform basic work activities.  *Id.*  In making this finding, the ALJ considered the four broad functional areas for evaluating mental disorders (the "Paragraph B" criteria) and in section 12.00 of the Listings of Impairments.  *Id.*

He determined that the record contained no evidence of limitation in activities of daily living or in social functioning, and she had only mild limitation in concentration, persistence, or pace.  *Id.*  He found Torres had experienced no episodes of decompensation of extended duration because of the "lack of inpatient psychiatric admissions in the record."  *Id.*  As a result, the ALJ determined Torres's mood disorder was non-severe.  *Id.*

At step three, the ALJ determined Torres did not have an impairment or combination of impairments that met or medically-equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Next, the ALJ determined Torres had the RFC to perform the full range of "light" work as defined in 20 C.F.R. § 416.967(b).  AR 23.  Specifically, the ALJ found Torres could lift and carry no more than ten pounds frequently and twenty pounds occasionally.  *Id.*  She could sit, stand, or walk for six hours, cumulatively, in an eight-hour workday.  *Id.*  In making this finding, the ALJ found that Torres' statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with his RFC assessment. *Id.*

In making his RFC assessment, the ALJ thoroughly summarized the entire medical record, both before the alleged onset date of May 20, 2010, and after.  AR 23-34.  He considered

18

and thoroughly summarized Torres's testimony at the administrative hearing, the objective medical evidence, Torres's doctors' various progress notes, and the various medical opinions. With respect to Dr. Kamal, the ALJ observed that as a consultative examiner, his opinion was accorded the weight of a non-treating expert medical opinion pursuant to 20 C.F.R. 416.927(d)(1)-(2).  AR 29.  Dr. Kamal opined that Torres could perform a medium level of exertion despite her impairments, with only a few postural limitations.  *Id.*  The ALJ gave Dr. Kamal's opinion "moderate weight."  The ALJ observed that Torres testified her condition had worsened despite the minimal findings on the x-ray of her lumbar spine taken October 5, 2010. Giving Torres the "maximum merit regarding her testimony," the ALJ reduced her RFC to light, a conclusion he found was supported by her lack of treatment for her back condition beyond pain management, including Torres' refusal to undergo laser surgery, as recommended by her physician.  Additionally, the ALJ noted there was no record of any surgical intervention.  AR 29-30.  The ALJ concluded a light RFC finding was also supported by the "rather slight" pathology indicated on the single imaging study in the record.  AR 30.  Torres also had undiminished motor strength and a normal gait in every examination in the record.  Further, tenderness and muscle spasm symptoms resolved, which led the ALJ to infer Torres' back condition was intermittent in nature.  Taken together, the ALJ found the clinical and laboratory findings suggested Torres was not precluded from all work.

The ALJ also considered Dr. Doncaster's consultative psychological examination of Torres.  He afforded Dr. Doncaster's opinion that Torres would have a difficult time returning to the workplace little weight.  He found Dr. Doncaster's opinion was internally inconsistent because Dr. Doncaster found Torres could perform simple work tasks but would have difficulty working.  Additionally, the ALJ noted that Torres did not treat for mental impairment on a regular basis, which suggests her mental impairment was non-severe because if it were severe, Torres "would actively seek treatment in an attempt to resolve it."  There is no record of any psychotherapy or counseling, which suggests that her mood disorder is adequately controlled with medication management by her pain management physician.  Further, the ALJ found that Torres's refusal to complete some of the tasks required by Dr. Doncaster—namely, serial threes

and serial sevens—precluded a full analysis of Torres's functional capabilities and was "not a reasonable basis for an award of disability benefits."

Next, the ALJ considered Dr. Oruene's medical statement dated January 27, 2012. He noted that although it referenced a treating relationship lasting fifteen months, there were only four treatment notes in the record. The ALJ gave Dr. Oruene's opinion that Torres could not perform even low stress jobs and could do less than light work little weight. AR 32. The ALJ found there was a lack of treatment history for Torres' back condition in the record beyond medication management. The ALJ found the record did not substantiate a progression of Torres's back disorder to the degree that Dr. Oruene stated. The ALJ concluded that if Torres' condition was as severe as she alleged, she would have actively sought treatment beyond medication management. The ALJ found that Torres' failure to do so detracted from her credibility. The ALJ found there was no mention in the record of "severe or profound pathology." Additionally, because the record only contained four treatment notes by Dr. Oruene, the ALJ found the treating relationship was not "truly longitudinal." Dr. Oruene only prescribed medication to control Torres' pain, which the ALJ found was "nothing more than routine, conservative care." The ALJ rejected Dr. Oruene's opinion as "nothing more than patient advocacy."

The ALJ also considered the findings of the DDS physicians and psychologists and afforded them the weight of non-examining medical experts. He afforded significant weight to the DDS opinions on Torres's physical condition and little weight to the psychological opinions. The DDS physical opinion was consistent with the lack of laboratory and clinical findings of record. The ALJ observed that back conditions are "typically expected to resolve over time," and Torres' accident occurred more than a decade ago. The treatment record was sparse, which led the ALJ to infer that Torres did not require significant treatment beyond medication management. The ALJ noted there was no record of any invasive treating modalities such as surgery, and there was no evidence of failed back syndrome. This led the ALJ to conclude that medication management adequately resolved Torres's "intermittent symptomatology." The ALJ found the DDS consultants adequately considered Torres's subjective complaints and the fact

that she received only conservative care for her impairments.  She declined laser intervention with Dr. Tadlock, and she only treated with Dr. Oruene on "a handful of occasions."  The ALJ found Torres did not actively treat her back condition during the period relevant to this claim.

In addition, Dr. Tadlock noted Torres was doing well on medications on a number of occasions, and Torres' physical examinations were "greatly unremarkable," with intermittent symptoms resolving in a short period of time.  Dr. Tadlock refused Torres' request to sign a form indicating that she required a lower level apartment in March 2010, which led the ALJ to infer that Torres exaggerated her symptoms and limitations.  The ALJ observed that Torres stopped treating with Dr. Tadlock shortly after this refusal.  Dr. Oruene's notes also consistently documented no evidence of excessive fatigue, allergy symptoms, balance issues, anxiety, depression, suicidal thoughts or concentration problems.  Beyond some diminished flexion/extension of the lumbar spine and positive straight leg raise, Torres's physical exams during the relevant period were largely unremarkable.  She had normal range of motion in all joints, and Dr. Kamal observed no straight leg findings at all.

With respect to the Paragraph B criteria, the ALJ found Torres had no restriction in her activities of daily living, no difficulty with social functioning, and only mild limitation in concentration, persistence, and pace.  He also found Torres had not experienced any episodes of decompensation of extended duration because her most recent hospitalization only lasted three days.  Additionally, he found Torres's "alleged suicide attempts" were years prior to her Title XVI application filing date.

At step four, the ALJ found Torres was not capable of performing her PRW as a medical assistant.  Although this work did not require the performance of work-related activities precluded by her RFC according to the VE's testimony, it could not be classified as PRW because Torres did not earn enough to amount to substantial gainful activity.

Accordingly, the ALJ proceeded to step five, where he found Torres was twenty-eight at the time she filed her application, which is defined as a younger individual by 20 C.F.R. § 416.963.  He found Torres had a limited eleventh grade education and was able to communicate in English.  Transferability of job skills was not material to the determination of

disability because applying Medical Vocational Rule 202.18 supported a finding of "not disabled" whether or not Torres had transferable job skills. Considering Torres' age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy that Torres could perform. Accordingly, the ALJ concluded that Torres had not been under a disability since May 20, 2010.

**D. The Parties' Positions.**

**1. Torres's Position.**

Torres contends the ALJ committed reversible error because he did not articulate clear and convincing reasons to reject Torres's testimony about the intensity, persistence, and limiting effect of her symptoms. Torres contends the ALJ rejected her testimony because it was "inconsistent with what the ALJ [believed] it should be." Torres asserts the ALJ's "unelaborated recitation" of the data in the AR did not satisfy the Ninth Circuit's requirement that an ALJ provide specific findings to justify discrediting a claimant's testimony. Torres contends the ALJ offered only boilerplate language, and at best, he rejected her testimony because it lacked support in the objective medical evidence, both of which are not legally sufficient reasons to discredit a claimant's symptom testimony. Torres also contends that Torres's treatment was not simply conservative because she underwent epidural injection therapy to relieve pain, and this demonstrates attempts at invasive care. In addition, the ALJ did not analyze how Torres's "meager" activities of daily living relate to the ability to perform gainful work activity, and his failure to do so is reversible error. Torres asserts that the court may not consider any post hoc rationales offered by the Commissioner for rejecting Torres's testimony.

Torres failed to comply with the court's Order Concerning Review of Social Security Cases (Dkt. #13). The order required her to provide a complete summary of all medical evidence in the AR that supports her claim of disability for each condition or ailment that allegedly renders her disabled, with precise references to the AR, or stipulate that the ALJ fairly and accurately summarized the medical evidence in the AR. Torres did neither, and her brief does not cite a single medical record or page in the AR supporting her claim of disability or reference records disputing the ALJ's findings.

### 2. Commissioner's Position.

The Commissioner asserts that the ALJ did not err in discrediting Torres's symptom testimony because he articulated several reasons to support his finding.   First, the ALJ determined that the objective medical evidence contradicted Torres' testimony of disabling pain and limitations.   The Commissioner asserts the ALJ did not discredit Torres' testimony because of a lack of objective evidence; instead, it was because the objective medical evidence conflicted with her testimony.   For example, the ALJ discussed that during the same period Torres claimed her condition was worsening, she had full motor strength, her range of motion in her joints was normal, and imaging studies showed only minimal disc disease.   The Commissioner also notes that Torres never had an MRI, a basic and common diagnostic tool for diagnosing the cause of back pain.

The Commissioner asserts the ALJ also rejected Torres' testimony because it conflicted with the conservative treatment she received.   The Commissioner asserts that the case Torres relies on to assert that epidural injections were invasive treatment does not stand for that proposition.   In that case, the court found that the claimant's treatment was not conservative because he had undergone physical therapy, epidural injections, and surgery.   *See Yang v. Barnhart*, No. ED CV 04-958-PJW, 2006 WL 3694857 at *4 (C.D. Cal. Dec. 12, 2006).   Here, the ALJ found Torres's treatment was conservative because it consisted only of narcotic pain management, and the record did not contain any "invasive treatment modalities."   The Commissioner asserts the ALJ properly concluded that Torres's failure to seek treatment beyond medication management undermined her testimony about her disabling pain and the limitations her impairments caused.   The Commissioner asserts that Torres admitted that medication alleviated much of her pain, and she frequently reported she was "doing well" on medication despite reporting severe pain.

Further, the ALJ observed Torres's statements were implausible or exaggerated.   For example, the ALJ noted that although Torres's injuries following the car accident were a hernia and vertebrae issues, thirteen years later, they had evolved into "two ruptures, two hernias, and issues from L3 to her sacrum."   Torres also claimed to have a bone spur on her forehead that

turned out to be a fat deposit. The ALJ found Dr. Tadlock's refusal to opine Torres's condition required a ground floor apartment illustrated that Torres exaggerated her physical condition. Finally, relying on *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008), the Commissioner also argues that even if the ALJ had not articulated valid reasons to discredit Torres's testimony, the court must still affirm the Commissioner's decision as long as there is substantial evidence in the AR to support it.

## IV.   Analysis and Findings.

Reviewing the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial evidence, and the ALJ did not commit legal error.

Torres was twenty eight years old when she filed her application for SSI benefits alleging she became disabled on May 10, 2010, from a herniated disc, a torn disc, sciatica, asthma, and depression. AR 70, 138. At the time she filed her claim she had not worked since 1999-2001. Her employment history report reflects that she earned $94.50 in 1999, $1,763.00 in 2000, and $4364.36 in 2001—amounts insufficient to qualify as substantial gainful activity. In this appeal, Torres' sole assignment of error is that the ALJ discredited Torres's disabling symptom testimony without articulating clear and convincing reasons for doing so. She has not challenged any other finding by the ALJ or cited a single medical record or page of the AR to support her position.

In evaluating the credibility of a claimant's testimony about subjective pain, an ALJ must engage in a two-step analysis. *See Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2006). First, the ALJ must determine whether a claimant presented objective medical evidence of underlying impairment(s) that could reasonably be expected to produce the pain or other alleged symptoms. *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citation omitted). Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony about her symptoms merely because they are unsupported by objective evidence. *See Berry v. Astrue,* 622 F.3d 1228, 1234 (9th Cir. 2010). Where there is no evidence of malingering, the ALJ can only reject a claimant's testimony about the severity of

her symptoms by stating clear and convincing reasons for doing so.  *See Lingenfelter,* 504 F.3d at 1036; *Valentine v. Comm'r of Soc. Sec. Admin.,* 574 F.3d 685, 693 (9th Cir. 2009).  General findings are insufficient; instead, an ALJ must identify the testimony that is not credible and what evidence undermines that testimony.  *See Berry,* 622 F.3d at 1234 (internal citation omitted).  Torres asserts that the ALJ committed reversible error because he did not articulate clear and convincing reasons to discredit Torres's testimony, and "at best," the ALJ rejected it because it lacked support in the objective medical evidence, which is insufficient.

The ALJ discredited Torres's testimony concerning the intensity, persistence, and limiting effects of her symptoms to the extent they were inconsistent with the ALJ's RFC assessment that Torres could perform the full range of light work pursuant to 20 C.F.R. § 416.967(b).  AR 23.  The ALJ initially noted the "extreme paucity of objective evidence" in the AR.  *See* AR 24. He also correctly pointed out that a large part of the medical records in the AR predate the alleged disability onset date.  AR 24.  Nevertheless, the ALJ reviewed and considered those records in making his findings. The ALJ noted that Torres reported improvement in her pain on February 12, 2008; that she was doing well on November 14, 2008, and that she continued to do well on September 22, 2009.  The ALJ found that Torres's physical examinations during this time were also largely normal or unremarkable.  *See* AR 24-25 (ALJ noted normal examinations on January 14, 2008; February 12, 2008; June 10, 2008; October 14, 2008; December 22, 2008; March 24, 2009; August 14, 2009; September 22, 2009; February 2, 2010 (normal except for a fat deposit); and May 7, 2010.  Notably, three days before the alleged disability onset date, Torres reported she was satisfied with her treatment, and her pain had not increased.  AR 249.  She also denied any issues with nausea, urination, constipation, itching, confusion, or sleepiness.  *Id.*

Subsequent to the alleged disability onset date, Torres began treating with Dr. Oruene, and she reported that she had no issues with concentration, anxiety, depression, suicidal thoughts, or difficulty with sleeping.  The ALJ noted that in an October 10, 2010 office visit Dr. Oruene's records indicate that Torres' musculoskeletal physical examination revealed normal flexion and extension of the cervical spine, decreased flexion to eighty degrees and extension to

five degrees of the lumbar sacral spine, no paraspinal muscle tenderness, and the range of motion for Torres's joints was normal.  The ALJ correctly found that Torres's physical examinations with Dr. Oruene were unchanged on November 29, 2010; December 29, 2010; February 15, 2011; and March 18, 2011.  *See* AR 26-27.  The ALJ found that the Dr. Oruene's records failed to substantiate a progression of Torres's back disorder to the degree Dr. Oruene opined in his medical source statement of January 27, 2012.  AR 32.  Furthermore, the ALJ found that Dr. Oruene's treatment notes consistently found no evidence of excessive fatigue, allergy symptoms, balance issues, anxiety, depression, suicidal thoughts, or concentration.

Additionally, the ALJ concluded that if Torres's back disorder was as severe as she alleged, she would have actively sought treatment beyond medication management to resolve it. *Id.*  The ALJ found the fact that she had not detracted from her credibility.  *Id.*  This is a permissible inference.  *See Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008) (internal citations omitted).  In addition, the ALJ also found Torres was less than credible about the severity of her symptoms because she had declined laser treatment recommended by her treating physician.  AR 29.  Reliance on unexplained, or inadequately explained, failures to seek or follow treatment is a permissible basis to discredit a claimant's testimony.  *Id.*

The ALJ also found that Torres had always been treated conservatively, and that her back pain was controlled by medication.  There is ample support in the AR for this finding.  The ALJ correctly found that Torres had never received any psychotherapy or counseling for her depression and anxiety.  Evidence of conservative treatment is sufficient to discount a claimant's testimony about the severity of an  impairment.  *See Parra v. Astrue,* 481 F.3d 742, 750-51 (9th Cir. 2007).  Torres argues that she underwent epidural injection therapy, which the court in *Yang v. Barnhart* found was more than conservative treatment.  *See* Motion at 10:5-6 (citing *Yang v. Barnhart,* No. ED CV 04-598-PJW, 2006 WL 3694857 at *4 (C.D. Cal. Dec. 12, 2006).  As an initial matter, there are no medical records in the AR documenting she received epidural injections; there are only subsequent records that indicate Torres claimed that she had them at some point in the past, and they were ineffective.

/ / /

26

1    Additionally, Torres misstates the court's finding in *Yang*.  The court did not find that

2    epidural injections, in and of themselves, were invasive/non-conservative treatment.  Rather, the

3    court found the claimant in *Yang* had treated with "potent drugs" (Tylenol #3 with codeine),

4    physical therapy, epidural injections, and neck surgery (that may or may not have been related to

5    the claimant's back pain).  The court found that it "did not seem apparent" this combination of

6    treatments was conservative.  *Id.*

7    The ALJ found Torres' testimony about her symptoms was inconsistent with the

8    objective medical evidence in the record.  AR 29, 30.  There is ample support in the record for

9    his findings that in each physical examination, Torres had undiminished motor strength, normal

10   range of motion and normal gait.  AR 30.  Her tenderness and spasm eventually resolved, which

11   led the ALJ to infer her back condition was intermittent.  *Id.*  These inconsistencies were an

12   appropriate ground for the ALJ to discount Torres's credibility.  *See Bray*, 554 F.3d at 1227.

13   The ALJ concluded that the fact that her treating physician denied her request for a doctor's note

14   for a first floor apartment indicated she exaggerated her symptoms.  This is a reasonable

15   inference, especially because the doctor denied her request weeks before the alleged date of

16   onset.  Additionally, as the ALJ correctly pointed out, shortly after the doctor denied this request

17   she changed pain management doctors. Although the ALJ cannot rely on objective evidence

18   alone to reject a claimant's subjective pain complaints, it is one factor the ALJ may properly

19   consider in his analysis.  *See generally* SSR 96-7p; *see also Rollins v. Massanari*, 261 F.3d 853,

20   857 (9th Cir. 2001).  The ALJ properly considered the objective evidence in discounting Torres's

21   symptom testimony.  *See Osenbrock*, 240 F.3d at 1165-66 (ALJ properly discounted pain

22   testimony where neurological and orthopedic exams were, for the most part, normal).

23   The court finds that the ALJ pointed to specific evidence in the record that undermined

24   Torres's claims that her impairments were so severe she could not work.  *See Valentine,* 574

25   F.3d at 693 (citing *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999)).

26   This evidence contradicted Torres's contentions about how debilitating her alleged impairments

27   were.  He resolved conflicts in the medical records and provided  clear and convincing reasons to

28   reject Torres's subjective testimony.  *See Morgan,* 169 F.3d at 601.  The ALJ did not, as Torres

motion argues, merely use conclusory, boilerplate language finding that the objective medical evidence did not support the degree of pain and limitation she alleged.   Rather, the ALJ comprehensively and systematically cited the AR he relied upon in making his findings.

Finally, Plaintiff contends the ALJ erred in failing to consider the differences between Torres' daily activities and her ability to work eight hours per day, five days per week, citing *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001).   There, the claimant testified that she could grocery shop, walk an hour, socialize with friends, play cards, swim, watch television, read, exercise, and do physical therapy.   The ALJ relied on that evidence to conclude the claimant's daily activities involved physical functions that were inconsistent with the claimant's reports of pain.   The Ninth Circuit found that the ALJ erred in concluding the claimant's activities of daily living undermined her credibility because there was "only a scintilla of evidence in the record" to support this finding.

Torres appears to be arguing that because her daily activities are "meager" and limited, she could not work.   The ALJ did not base his credibility finding on any inconsistency between Torres' daily activities and her symptom testimony.   As the Ninth Circuit has observed, and Torres cites in her brief, "Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility."   *See* Motion to Remand at 10:17-20 (citing *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998)).   Here, Torres' level of activity is consistent with her claimed limitations.   The ALJ did not err in failing to consider Torres' activities in making his credibility determination.

The court finds the ALJ articulated clear and convincing reasons, supported by substantial evidence in the record, to discount Torres' subjective complaints.   The court must defer to the ALJ's credibility determination when it is supported by specific findings, as the ALJ's determination was here.   *See Flaten*, 44 F.3d at 1453 (internal citation omitted).   Where the ALJ's finding is supported by substantial evidence, as the ALJ's determination is here, the court "may not engage in second-guessing" the ALJ.   *Tommasetti,* 533 F.3d at 1039 (9th Cir. 1995).   The court finds the ALJ properly evaluated Torres' credibility and did not commit reversible error.

## V.     Conclusion.

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  If the record will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's.  *Flaten,* 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and differences of opinion.  Having reviewed the AR as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

For all of the foregoing reasons,

**IT IS RECOMMENDED**:

1.      Torres's Motion to Remand (Dkt. #16) be DENIED.

2.      The Commissioner's Cross-Motion to Affirm (Dkt. #23) be GRANTED.

Dated this 15th day of September, 2014.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE